LEAVITT, GOVERNOR OF UTAH, ET AL. *v.*
JANE L. ET AL.

No. 95–1242.   Decided June 17, 1996

PER CURIAM.

The State of Utah seeks review of a ruling by the Court of Appeals for the Tenth Circuit which declared invalid a provision of Utah law regulating abortions "[a]fter 20 weeks gestational age." Utah Code Ann. § 76–7–302(3) (1995).

The court made that declaration, not on the ground that the provision violates federal law, but rather on the ground that the provision was not severable from another provision of the same statute, purporting to regulate abortions up to 20 weeks' gestational age, which had been struck down as unconstitutional. The court's severability ruling was based on its view that the Utah Legislature would not have wanted to regulate the later-term abortions unless it could regulate the earlier-term abortions as well. Whatever the validity of such speculation as a general matter, in the present case it is flatly contradicted by a provision in the very part of the Utah Code at issue, explicitly stating that each statutory provision was to be regarded as having been enacted independently of the others. Because we regard the Court of Appeals' determination as to the Utah Legislature's intent to be irreconcilable with that body's own statement on the subject, we grant the petition for certiorari as to this aspect of the judgment of the Court of Appeals, and summarily reverse.

Utah law, as amended by legislation enacted in 1991, establishes two regimes of regulation for abortion, based on the term of the pregnancy. With respect to pregnancies 20 weeks old or less, § 302(2) permits abortions only under five enumerated circumstances, Utah Code Ann. § 76–7–302(2) (1995). With respect to pregnancies of more than 20 weeks, § 302(3) permits abortions under only three of the five circumstances specified in § 302(2). § 76–7–302(3).[1] In the

---

[1] The two subsections state:

"(2) An abortion may be performed in this state only under the following circumstances:

"(a) in the professional judgment of the pregnant woman's attending physician, the abortion is necessary to save the pregnant woman's life;

"(b) the pregnancy is the result of rape or rape of a child . . . that was reported to a law enforcement agency prior to the abortion;

"(c) the pregnancy is the result of incest . . . and the incident was reported to a law enforcement agency prior to the abortion;

present suit for declaratory and injunctive relief, the District Court for the District of Utah held § 302(2) to be unconstitutional, but § 302(3) to be both constitutional and severable— *i. e.*, enforceable despite the invalidation of the other provision. *Jane L.* v. *Bangerter,* 809 F. Supp. 865, 870 (1992). Upon appeal by the plaintiffs with regard to the latter provision, the Court of Appeals for the Tenth Circuit held that it could not be enforced, regardless of its constitutionality, because it was not severable from the invalidated portion of the law. *Jane L.* v. *Bangerter,* 61 F. 3d 1493, 1499 (1995). The State argues that that conclusion is simply unsustainable in light of the Utah Legislature's express indication to the contrary, and we agree.

Severability is of course a matter of state law. In Utah, as the Court of Appeals acknowledged, the matter "is determined first and foremost by answering the following question: Would the legislature have passed the statute without the unconstitutional section?" *Id.,* at 1497 (citing *Stewart* v. *Utah Public Service Comm'n,* 885 P. 2d 759, 779 (Utah 1994)). A provision of the abortion part of the Utah Code, to which these two sections were added, answers that question. Section 317 provides:

> "If any one or more provision, section, subsection, sentence, clause, phrase or word of this part or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be

---

"(d) in the professional judgment of the pregnant woman's attending physician, to prevent grave damage to the pregnant woman's medical health; or

"(e) in the professional judgment of the pregnant woman's attending physician, to prevent the birth of a child that would be born with grave defects.

"(3) After 20 weeks gestational age, measured from the date of conception, an abortion may be performed only for those purposes and circumstances described in Subsections (2)(a), (d), and (e)." Utah Code Ann. § 76–7–302 (1995).

severable and the balance of this part shall remain effective notwithstanding such unconstitutionality. *The legislature hereby declares that it would have passed this part, and each provision, section, subsection, sentence, clause, phrase or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.*" Utah Code Ann. § 76–7–317 (1995) (emphasis added).

In the face of this statement by the Utah Legislature of its own intent in enacting regulations of abortion, the Court of Appeals nonetheless concluded that §§ 302(2) and 302(3) were *not* severable because the Utah Legislature did not intend them to be so. The Court of Appeals' opinion not only did not regard the explicit language of § 317 as determinative—it did not even use it as the point of departure for addressing the severability question. It understood Utah law as instructing courts to "subordinate severability clauses, which evince the legislature's intent regarding the *structure* of the statute, to the legislature's overarching *substantive* intentions." 61 F. 3d, at 1499 (emphasis added). The court divined in the 1991 amendments a "substantive intent" to prohibit virtually all abortions, see *id.*, at 1497–1498, and went on to conclude that since, in its view, severing § 302(2) from § 302(3) would frustrate this overarching purpose, both provisions had to stand or fall together, see *id.*, at 1499. We believe that the Court of Appeals erred at both steps of this progression.

The dichotomy between "structural" and "substantive" intents is nowhere to be found in the Utah cases cited as authority by the Court of Appeals. Indeed, none of those cases even speaks in terms of "conflicts among legislative intentions," *id.*, at 1498. The cases *do* support the proposition that, "even where a savings clause exist[s], where the provisions of the statute are interrelated, it is not within the scope of th[e] court's function to select the valid portions of

the act and conjecture that they should stand independently of the portions which are invalid." *State* v. *Salt Lake City*, 445 P. 2d 691, 696 (Utah 1968). See also *Salt Lake City* v. *International Assn. of Firefighters*, 563 P. 2d 786, 791 (Utah 1977); *Carter* v. *Beaver County Service Area No. One*, 399 P. 2d 440, 441 (Utah 1965). But those concerns are absent from this case, for two reasons. First, because there is no need to resort to "conjecture": The legislature's abortion laws include not merely the standard "saving" clause, but a provision that could not be clearer in its message that the legislature "would have passed [every aspect of the law] irrespective of the fact that any one or more provision . . . be declared unconstitutional." § 76–7–317.[2] And second, because the two sections at issue here are *not* "interrelated" in any relevant sense—*i. e.*, in the sense of being so interdependent that the remainder of the statute cannot function effectively without the invalidated provision, or in the sense that the invalidated provision could be regarded as part of a legislative compromise, extracted in exchange for the inclusion of other provisions of the statute.[3] Nothing like that appears here. The Court of Appeals described § 302(3) as

---

[2] In none of the Utah cases relied upon by the Court of Appeals was there a legislative statement of this sort. In both *Salt Lake City* v. *International Assn. of Firefighters*, 563 P. 2d 786 (1977), and *Carter* v. *Beaver County Service Area No. One*, 399 P. 2d 440 (1965), the saving clauses at issue simply declared: "If any provision of this act, or the application of any provision to any person or circumstance, is held invalid, the remainder of this act shall not be affected thereby." See 1975 Utah Laws, ch. 102, § 10; 1961 Utah Laws, ch. 34, § 3. And in *State* v. *Salt Lake City*, 445 P. 2d 691, 696 (1968), the court treated the saving clause in the municipal ordinance under review as no different from the one discussed in *Carter*, upon which the court relied.

[3] Compare *International Assn. of Firefighters, supra*, at 791 ("The [invalidated] provisions . . . are *an integral part* of the act. . . . The concept of binding arbitration is *wholly interdependent* with the other provisions of the act"); *Carter, supra*, at 441–442 ("[T]he separability clause . . . is ineffective, because of the *dependency* of the remaining sections upon the provisions declared inoperative") (emphases added).

"modif[ying]" § 302(2), and concluded that, "[w]ith the nullification of the abortion ban in section 302(2), the statute was gutted, and section 302(3) was left purposeless without an abortion ban to modify." 61 F. 3d, at 1498. But as examination of the provisions makes apparent, see n. 1, *supra,* § 302(3) cannot possibly be said to "modify" § 302(2) in the sense of being an adjunct to it, as an adjective "modifies" a noun. Rather, it can be said to "modify" § 302(2) only in the sense of altering its disposition—permitting, for post-20-week abortions, some but not all of the justifications allowed (for earlier-term abortions) by § 302(2). It is impossible to see how this could lead to the conclusion that § 302(3) is left "purposeless" when § 302(2) is declared inoperative. Of course § 302(3) does incorporate by reference permissible justifications for abortion set forth in § 302(2), instead of repeating them verbatim, but this drafting device can hardly be thought to establish such "interdependence" that § 302(3) becomes "purposeless" when § 302(2) is unenforceable. To the contrary, § 302(3) sets out in straightforward and self-operative fashion the circumstances under which an abortion may be performed "[a]fter 20 weeks gestational age."

But even if the Court of Appeals were correct in treating § 317 like an ordinary saving clause; even if it were right in believing that there existed the "interrelationship" between §§ 302(2) and 302(3) that would permit an ordinary saving clause to be disregarded; and even if it had not invented the notion of "structural-substantive" dichotomy; the reasoning by which it concluded that the "substantive" intent of the Utah Legislature was to forgo all regulation of abortion unless it could obtain total regulation is flawed. The court reasoned that, because the intent of the 1991 amendments was "to prohibit all abortions, regardless of when they occur during the pregnancy, except in the few specified circumstances," 61 F. 3d, at 1497, and because §§ 302(2) and 302(3) "operated as a unified expression of [that] intent," *ibid.,* for

the court to separate § 302(2) from § 302(3) based on the unconstitutionality of the former would "clearly undermin[e] the legislative purpose to ban most abortions," *id.*, at 1498.[4]

This mode of analysis, if carried out in every case, would operate to defeat every claim of severability. Every legislature that adopts, in a single enactment, provision A plus provision B intends (A+B); and that enactment, which reads (A+B), is invariably a "unified expression of that intent," so that taking away A from (A+B), leaving only B, will invariably "clearly undermine the legislative purpose" to enact (A+B). But the fallacy in applying this reasoning to the severability question is that it is not the *severing* that will take away A from (A+B) and thus foil the legislature's intent; it is the *invalidation* of A (in this case, because of its unconstitutionality) which does so—an invalidation that occurs *whether or not* the two provisions are severed. The relevant question, in other words, is not whether the legislature would prefer (A+B) to B, because by reason of the invalidation of A that choice is no longer available. The relevant question is whether the legislature would prefer not to have B if it could not have A as well. Here, the Court of Appeals in effect said yes. It determined that a legislature bent

---

[4] The Court of Appeals also adverted to Utah Code Ann. § 76–7–317.2 (1995), which it interpreted as "making an exception to the general severability clause specifically for section 302." *Jane L.* v. *Bangerter*, 61 F. 3d, at 1499. Section 317.2 does nothing of the sort. It provides, simply, that "[i]f Section 76–7–302 as amended by Senate Bill 23, 1991 Annual General Session, is ever held to be unconstitutional by the United States Supreme Court, Section 76–7–302, as enacted by Chapter 33, Laws of Utah 1974, is reenacted and immediately effective." This provision does not speak to severability, but to the consequence of invalidation, presumably total invalidation. (For if the invalidation of § 302(2) alone triggered § 317.2, then *all* of § 302 would be replaced by the pre-existing, 1974 version. But the Court of Appeals did not decree § 302(1) as inoperative, nor did respondents seek that result.) Respondents make no effort to defend the ruling below on the basis of § 317.2.

on banning almost all abortions would prefer, if it could not have that desire, to ban no abortions at all rather than merely some. This notion is, at the very least, questionable when considered in isolation. But when it is put forward in the face of a statutory text that explicitly states the opposite, it is plainly error.

*    *    *

We have summarily set aside unsupportable judgments in cases involving only individual claims, see, *e. g., Board of Ed. of Rogers* v. *McCluskey*, 458 U. S. 966, 969–971 (1982); *National Bank of North America* v. *Associates of Obstetrics & Female Surgery, Inc.*, 425 U. S. 460, 460–461 (1976). Much more is that appropriate when what is at issue is the total invalidation of a statewide law, see, *e. g., Idaho Dept. of Employment* v. *Smith*, 434 U. S. 100, 100–102 (1977). To be sure, we do not normally grant petitions for certiorari solely to review what purports to be an application of state law; but we have done so, see *Steele* v. *General Mills, Inc.*, 329 U. S. 433, 438, 440–441 (1947); *Wichita Royalty Co.* v. *City Nat. Bank of Wichita Falls*, 306 U. S. 103, 107 (1939),[5] and undoubtedly should do so where the alternative is allowing

---

[5] The dissent says that our review in *Wichita Royalty Co.* "was plainly motivated by a concern to give effect to [the] new mandate" of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), that federal courts apply state substantive law in diversity cases. *Post*, at 147. It remains the case, however, that "the *only* question for our decision" was whether the Court of Appeals was correct in its interpretation of state law. 306 U. S., at 107 (emphasis added). As for *Steele* v. *General Mills, Inc.*, 329 U. S. 433 (1947), there our review was prompted by concern that the judgment below "undermine[d] the transportation policy of Texas," *id.*, at 438. But unless we were wrong in *Steele* to regard this as "a question of such importance" as to justify review, *ibid.*, the Tenth Circuit's "undermin[ing] [of] the [abortion] policy of [Utah]" presents an issue equally worth our attention. If the dissent is correct that *Steele* was our last case of this sort, it indicates only that we have not since been faced with a federal court's equivalently clear misinterpretation of a state law of equivalent significance.

blatant federal-court nullification of state law. The dissent argues that "[t]he doctrine of judicial restraint" weighs against review, *post*, at 146, but it is an odd notion of judicial restraint that would compel us to cast a blind eye on over-reaching by lower federal courts. The fact observed by the dissent, that the "underlying substantive issue in this case" is a controversial one, generating "a kind of 'hydraulic pressure' that motivates ad hoc decisionmaking," *ibid.*, provides a greater, not a lesser, justification for reversing state-law determinations that seem plainly wrong. In our view, these considerations combine to make this an "extraordinary cas[e]" worth our effort of summary review, *post*, at 147.

Finally, the dissent's appeal to the supposed greater expertise of courts of appeals regarding state law is particularly weak (if not indeed counterindicative) where a Court of Appeals panel consisting of judges from Oklahoma, Colorado, and Kansas has reversed the District Court of Utah on a point of Utah law. If, as we have said, the courts of appeals owe no deference to district court adjudications of state law, see *Salve Regina College* v. *Russell*, 499 U. S. 225, 239–240 (1991), surely there is no basis for regarding panels of circuit judges as "better qualified" than we to pass on such questions, see *post*, at 146. Our general presumption that courts of appeals correctly decide questions of state law reflects a judgment as to the utility of reviewing them in most cases, see *Salve Regina College, supra*, at 235, n. 3, not a belief that the courts of appeals have some natural advantage in this domain, cf. *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 500 (1985) ("[W]e surely have the authority to differ with the lower federal courts as to the meaning of a state statute"); *Cole* v. *Richardson*, 405 U. S. 676, 683–685 (1972). That general presumption is obviously inapplicable where the court of appeals' state-law ruling is plainly wrong, a conclusion that the dissent does not even contest in this case.

The opinion of the Tenth Circuit in this case is not sustainable. Accordingly, we grant the petition as to the severability question, summarily reverse the judgment, and remand the case to the Court of Appeals for further proceedings.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The severability issue discussed in the Court's *per curiam* opinion is purely a question of Utah law. It is contrary to our settled practice to grant a petition for certiorari for the sole purpose of deciding a state-law question ruled upon by a federal court of appeals. The justifications for that practice are well established: The courts of appeals are more familiar with and thus better qualified than we to interpret the laws of the States within their Circuits; the decision of a federal court (even this Court) on a question of state law is not binding on state tribunals; and a decision of a state-law issue by a court of appeals, whether right or wrong, does not have the kind of national significance that is the typical predicate for the exercise of our certiorari jurisdiction.*

The underlying substantive issue in this case generates what Justice Holmes once described as a kind of "hydraulic pressure" that motivates ad hoc decisionmaking. *Northern Securities Co.* v. *United States,* 193 U. S. 197, 401 (1904) (dissenting opinion). Even if the court of appeals has rendered an incorrect decision, that is no reason for us to jettison the traditional guides to our practice of certiorari review. The doctrine of judicial restraint counsels the opposite course.

---

*The majority finds deference to the Court of Appeals "counterindicative" because it reversed the District Court for the District of Utah on a point of Utah law. *Ante,* at 145. But courts of appeals owe district courts no deference on state-law questions; they review such matters *de novo.* See *Salve Regina College* v. *Russell,* 499 U. S. 225, 235–240 (1991) (rejecting reliance on the "local expertise" of the District Court). The geography of the Circuit, see *ante,* at 145, is utterly irrelevant.

The majority counters with a pair of cases that supposedly show the absence of a settled practice regarding review of state-law questions. One of those—*Wichita Royalty Co.* v. *City Nat. Bank of Wichita Falls*, 306 U. S. 103 (1939)—was a diversity case decided in the wake of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938). Just four weeks before we handed down *Erie*, the Court of Appeals had disclaimed its obligation to follow a controlling decision by the Texas Supreme Court (indeed, one rendered in an earlier stage of the same proceedings) on a matter of Texas commercial law. 306 U. S., at 106. The Court of Appeals then denied rehearing on the theory that the Texas court had changed its mind and now agreed with the former's view of the law. *Ibid.* Our decision to hear that case, which resulted in our rejection of the lower court's conclusion, was plainly motivated by a concern to give effect to *Erie*'s new mandate.

That leaves the single example of *Steele* v. *General Mills, Inc.*, 329 U. S. 433 (1947), in which this Court granted certiorari because the lower court's judgment "undermine[d] the transportation policy of Texas." *Id.*, at 438. Decided nearly 50 years ago and without successor, *Steele* is the exception that proves the rule.

However irregular such grants were in the past, they are now virtually unheard of. Indeed, in 1980 we codified our already longstanding practice by eliminating as a consideration for deciding whether to review a case the fact that "a court of appeals has . . . decided an important state or territorial question in a way in conflict with applicable state or territorial law." Compare this Court's Rule 19(1)(b) (1970) with this Court's Rule 17.1 (1980). That deletion—the *only* deletion of an entire category of cases—was intended to communicate our view that errors in the application of state law are not a sound reason for granting certiorari, except in the most extraordinary cases. Tellingly, the majority does not cite a single example during the past 16 years in which we

have departed from this reemphasized practice.   This case should not be the first.

Accordingly, I respectfully dissent from the decision to grant the petition.