# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2312

_____

| | | |
|---|---|---|
| Terry K. Jones, doing business as | * | |
| Filling Station, Inc.; William H. Miller, | * | |
| doing business as Bills World, Inc.; | * | |
| Bradly Alan Joslin, Inc.; | * | |
| Becks Oil Company, of Illinois, | * | |
| | * | |
| Appellees, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Southern District of Iowa |
| | * | |
| Thomas J. Vilsack, in his official | * | [TO BE PUBLISHED] |
| capacity as Governor of the | * | |
| State of Iowa; Stephen C. Gleason, | * | |
| in his official capacity as | * | |
| Director of the Iowa Department | * | |
| of Public Health, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: November 1, 2001
Filed: December 5, 2001

_____

Before BYE, BEAM, and RILEY, Circuit Judges.

_____

BYE, Circuit Judge.

Iowa's Tobacco Use Prevention and Control Act (Control Act) prohibits retailers from giving away tobacco products and from providing free goods and other

concessions in exchange for the purchase of tobacco products. Iowa Code § 142A.6(6). Several retailers who sell tobacco products in Iowa filed this action contending that § 142A.6(6) is preempted by the Federal Cigarette Labeling and Advertising Act (FCLAA), which bars states from regulating the "advertising or promotion of any cigarettes." 15 U.S.C. § 1334(b). The district court accepted the retailers' arguments and held the pertinent provisions of the Control Act preempted. We affirm in part, reverse in part, and remand for further proceedings.

I

The Governor of Iowa, Thomas Vilsack, signed the Control Act into law on May 15, 2000. The Control Act establishes "a comprehensive partnership among the general assembly, the executive branch, communities, and the people of Iowa in addressing the prevalence of tobacco use in the state." Iowa Code § 142A.1(1). The Control Act seeks to reduce tobacco use "by engaging all who are affected by the use of tobacco in the state, including smokers and nonsmokers, youth, and adults." Id. § 142A.1(3). Although the Control Act affects all citizens, portions of the Control Act "will specifically address reduction of tobacco use by youth and pregnant women, promotion of compliance by minors and retailers with tobacco sales laws and ordinances, and enhancement of the capacity of youth to make healthy choices." Id. § 142A.1(2).

The Control Act establishes an "initiative" to reduce the use of tobacco products by youth and pregnant women and to increase compliance by minors and retailers with tobacco sales laws and ordinances. Id. § 142A.6(1)-(2). The initiative will sponsor media, marketing, and communications programs. Id. § 142A.7(1). The Control Act also creates a "commission" to implement and monitor the initiative. Id. §§ 142A.3-142A.5. The commission will conduct surveys and studies, and will measure the progress of the initiative by collecting a variety of data from local, state, and federal monitors. Id. § 142A.7(1)(d).

Quite apart from developing a new tobacco prevention bureaucracy, the Control Act flatly prohibits the following retail sales practices designed to place tobacco products in the hands of consumers:

a.    A manufacturer, distributor, wholesaler, retailer, or distributing agent or agent thereof shall not give away cigarettes or tobacco products.

b.    A manufacturer, distributor, wholesaler, retailer, or distributing agent or agent thereof shall not provide free articles, products, commodities, gifts, or concessions in any exchange for the purchase of cigarettes or tobacco products.

Iowa Code § 142A.6(6)(a)-(b).

According to the retailers, these provisions of the Control Act hamper their businesses. The retailers contend that these provisions preclude them from participating in national sales promotions orchestrated by tobacco manufacturers that often involve redeeming cents-off coupons and proofs of purchase, distributing related merchandise with tobacco products (such as a free lighter with a pack of cigarettes), and offering two-for-one sales. The give-aways and concessions foreclosed by the Control Act attract customers and generate significant sales revenue for retailers. The retailers believe that such concessions are essential to their economic viability because federal and state regulations have severely curtailed advertising and other avenues of communicating with consumers. The Control Act particularly affects retailers situated near Iowa's borders, some of whom are plaintiffs in the present action. Border stores face stiff competition from nearby out-of-state retailers unaffected by § 142A.6(6) of the Control Act.

Shortly after the Control Act took effect, several retailers filed a complaint against Governor Vilsack and Stephen Gleason, the Director of the Iowa Department of Public Health (together, "the State") in federal district court. The retailers

contended that § 142A.6(6) of the Control Act is preempted by the FCLAA, 15 U.S.C. § 1334(b), that it violates their First Amendment commercial speech rights, and that it interferes with their liberty and property rights safeguarded by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The parties generally agreed on the pertinent facts and presented the case to the district court on cross-motions for summary judgment. The district court determined that § 142A.6(6) of the Control Act was preempted by the FCLAA and granted the retailers' motion. The State now appeals the district court's preemption decision, a ruling we review de novo. See Bock v. St. Louis S.W. Ry. Co., 181 F.3d 920, 922 (8th Cir. 1999).

II

Background preemption principles are familiar to all. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Thus state law that conflicts with federal law has no effect. Maryland v. Louisiana, 451 U.S. 725, 746 (1981).

To determine whether federal law preempts state law, we must discern Congress's intentions, which the Supreme Court has described as the "ultimate touchstone" of preemption analysis. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quotation omitted). We do not lightly deem state law to be superseded by federal law due to our solicitude for the states' exercise of their traditional police powers. See id. Yet we may not shrink from recognizing that federal law supplants state law when Congress clearly manifests that intention.

The clearest indication that federal law supplants state law is a statutory preemption provision. When Congress expressly codifies its preemptive intent in statutory form, our analysis "begins with the language of the statute." Lorillard Tobacco Co. v. Reilly, 121 S. Ct. 2404, 2415 (2001). The federal law we consider

-4-

in this case, the FCLAA, contains such a preemption provision, 15 U.S.C. § 1334(b). Because "the pre-emptive scope of the [FCLAA] is governed entirely by the express language in § [1334(b)]," Cipollone, 505 U.S. at 517, we devote our attention to its precise terms.

A

In its initial form, the FCLAA preempted regulation of cigarette advertising only: "No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Pub. L. No. 89-92, § 5(b), 79 Stat. 282, 283 (1965). Congress revised the FCLAA in 1969 when new scientific evidence disclosed previously unforeseen risks associated with tobacco use. The Public Health Cigarette Smoking Act, Pub. L. No. 91-222, 84 Stat. 87, amended several aspects of the FCLAA, including its preemption provision. While the 1965 Act had preempted the regulation of advertising, the 1969 amendment preempted both advertising and promotion:

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

15 U.S.C. § 1334(b).

"Without question, 'the plain language of the pre-emption provision in the 1969 Act is much broader.'" Lorillard, 121 S. Ct. at 2416-17 (quoting Cipollone, 505 U.S. at 520 (plurality opinion)). We address the language of the 1969 Act in this case because Congress has not amended § 1334(b) in the intervening years.

The literal terms of § 1334(b) delineate five requirements for federal preemption of state regulatory efforts. The provision preempts (1) state regulations (2) based on smoking and health (3) concerning the advertising or promotion (4) of cigarettes (5) whose labels comply with the FCLAA.

Four of the five requirements are readily established in the present case. Iowa's Control Act is unquestionably a state regulation. The State has also conceded that its prohibition on give-aways and concessions stems from a concern for the public health. Compare Amended Complaint ¶ 33 ("The new tobacco control law . . . is clearly a public health measure."), with Answer ¶ 33 ("Defendants admit the allegations of paragraph 33."). The Control Act explicitly regulates tobacco products, which the Act defines to include cigarettes. Id. § 142A.2(12). Finally, the State agrees that cigarette packages sold by the retailers comport with the FCLAA's intricate labeling scheme, 15 U.S.C. § 1333.

The dispute in this case centers upon the third element, whether § 142A.6(6) of the Control Act concerns "advertising or promotion." By all accounts, the Control Act does not disturb retailers' opportunities to advertise cigarettes for sale; and neither the State nor the retailers have opined that § 142A.6(6) might be preempted as an impermissible regulation of "advertising." Thus the parties' dispute may be further winnowed to the following question: do the activities prohibited in § 142A.6(6) constitute the promotion of cigarettes? The FCLAA does not define the term "promotion," so both the State and the retailers have proposed their own preferred definitions.

The State contends that we must construe the term "promotion" extremely narrowly so that § 1334(b) preemption does not emasculate its police powers. We disagree. In Cipollone, a majority of the Justices of the Supreme Court rejected an invitation to construe § 1334(b) preemption narrowly. "Under the Supremacy Clause, . . . our job is to interpret Congress's decrees of pre-emption neither narrowly nor

broadly, but in accordance with their apparent meaning." Cipollone, 505 U.S. at 544 (Scalia, J., with whom Thomas, J., joins); id. at 532 (Blackmun, J., with whom Kennedy and Souter, JJ., join) ("An interpreting court must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). More recently, the Court described the language of § 1334(b) as "sweeping," Lorillard, 121 S. Ct. at 2415, further eschewing the "narrow construction" approach proposed by the State in this appeal. We think the Court's position is clear: we must not interpret the term "promotion" more narrowly than its plain and ordinary meaning would suggest.

Our obligation to ascertain the plain meaning of "promotion" does not require us to establish an all-purpose definition capable of deciding each and every § 1334(b) preemption dispute that might arise. We are not lexicographers, nor should we be. Our task is simply to discern whether the particular conduct proscribed by the Control Act naturally falls within the range of meaning ordinarily attributed to the term "promotion." We think it does.

Two federal reports on tobacco use and marketing describe the promotion of cigarettes as including conduct banned by the Control Act. The Federal Trade Commission's (FTC) 1998 Report to Congress describes the "distribution of cigarette samples and specialty gift items" as "sales promotion activities." App. 50. And the Surgeon General's 1994 report, Preventing Tobacco Use Amongst Young People, lists in detail a variety of promotions conducted by tobacco companies:

> Promotional activities can take many forms. Promotional expenditures can stimulate retailers to place and display products in ways that will maximize the opportunity for purchase (e.g., supplying retailers with point-of-purchase displays to locate products at checkout stands). Coupons reduce the price a consumer pays for products and thereby reduce the consumer's cost-sensitivity, which may be a substantial barrier to making a purchase. Premiums (e.g., including a cigarette

lighter in the purchase price or even within the actual packaging of a box or carton of cigarettes) reduce cost-sensitivity by increasing (or appearing to increase) the value of a purchase. Free samples do away with cost-sensitivity altogether and actually give consumers an opportunity to try something new. Promotional devices such as these are more likely than advertising alone to lead consumers to purchase a product more than once—a pattern sought by all manufacturers.

App. 177 (internal citations omitted).

The FTC Report and the Surgeon General's Report do not, of course, announce formal agency definitions of "promotion" to which we owe a measure of deference. But we find the Reports' use of "promotion" probative of the term's plain and ordinary meaning in the context of cigarette marketing. To be sure, the FTC and the Surgeon General are experts on the topic. The FCLAA charges the FTC with a duty to report to Congress on the "current practices and methods of cigarette advertising and promotion," 15 U.S.C. § 1337(b)(1), and the Surgeon General's Reports historically have provided the political and scientific impetus to enact and amend the FCLAA. Thus we consider the Reports' use of the term "promotion" indicative of the term's plain and ordinary meaning.

Recent Supreme Court opinions also guide us in ascertaining the plain meaning of "promotion." The Court has twice employed the term in its tobacco regulation cases to describe conduct akin to that proscribed in the Control Act. Two Terms ago, in FDA v. Brown & Williamson Tobacco Corp., the Court emphasized that the federal Food and Drug Administration's regulation of tobacco company promotions "prohibit the distribution of any promotional items, such as T-shirts or hats, bearing the manufacturer's brand name." 529 U.S. 120, 128 (2000). And last Term, in a portion of the Lorillard opinion, the Court recounted the FTC's role in monitoring advertising and promotional campaigns conducted by tobacco companies. The Court

described retailer give-aways and the receipt of free merchandise in exchange for buying cigarettes as "promotions."

> In 1999, . . . the FTC reported that the cigarette industry expended $8.24 billion on advertising and promotions, the largest expenditure ever. Substantial increases were found in point-of-sale *promotions*, payments made to retailers to facilitate sales, and retail offers such as buy one, get one free, or product giveaways.

Lorillard, 121 S. Ct. at 2416 (emphasis added) (internal citations omitted).

Finally, we believe that dictionary definitions of "promotion" suggest a plain and ordinary meaning of the term that encompasses conduct prohibited by the Control Act. Merriam-Webster's Collegiate Dictionary defines "promotion" as "the act of furthering the growth or development of something; *especially*: the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting." Available at http://www.m-w.com (last visited November 26, 2001). A more specific definition—one aligned with the context of the present dispute—would include "[a]ll forms of communication other than advertising that call attention to products and services by adding extra values toward the purchase. Includes temporary discounts, allowances, premium offers, coupons, contests, sweepstakes, etc." University of Texas, Department of Advertising, Dictionary of Terminology, at http://advertising.utexas.edu (within "Research Resources" link) (last visited November 26, 2001). The latter definition fairly tracks Congress's intent by distinguishing advertising from promotion in its opening clause. Congress obviously distinguished between the two in 1969 by amending the FCLAA's preemption provision (which then mentioned only advertising) to regulate the promotion of cigarettes as well.

We think it abundantly clear that the activities prohibited by the Control Act are promotions. The Control Act prohibits retailers from offering "free articles,

products, commodities, gifts, or concessions in any exchange for the purchase of cigarettes or tobacco products." Under this regime, retailers could not give away T-shirts, see Brown & Williamson, 529 U.S. at 128-29, offer buy one/get one free concessions, see Lorillard, 121 S. Ct. at 2416, redeem cents-off coupons and proofs-of-purchase, see Surgeon General's Report, supra at 7-8, or engage in other sales practices commonly utilized by cigarette retailers. Retailers who offer consumers free cigarettes or other free products unquestionably add extra value to consumers' underlying purchases. There is little room for doubt that the Control Act prohibits retailers from engaging in activities which promote cigarettes.

Because states may not regulate such cigarette promotions, 15 U.S.C. § 1334(b), we hold that the provisions of the Control Act challenged by the retailers, § 142A.6(6)(a)-(b), are preempted by federal law.

B

The State raises several objections to this plain meaning analysis, none of which we find persuasive.

First, the State argues that the scope of FCLAA preemption may not extend beyond the regulatory scope of its substantive provisions. The State points to the overall structure of the FCLAA, and to its varied substantive provisions, as evidence that Congress intended to regulate only mass-media advertising and cigarette package labeling. Finding no substantive regulation in the FCLAA of the sales practices forbidden by the Control Act, the State contends that § 1334(b) should not be interpreted to preempt them.

We disagree with the State's premise that we may compare the FCLAA's substantive provisions to deduce Congress's preemptive intent from their structural composition. "[T]here is no need to infer congressional intent to pre-empt state laws

from the substantive provisions of the legislation. Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." Cipollone, 505 U.S. at 517 (internal citations and quotations omitted). This principle holds true "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority." Id. (internal citations and quotations omitted). Cipollone explains that the scope of FCLAA preemption is governed by the express language in § 1334(b), and we therefore reject the State's effort to discard § 1334(b)'s plain and ordinary meaning in favor of a competing interpretation forged from the substantive provisions within the FCLAA.

Second, the State invites us to rely on committee reports produced during Congress's debates on the 1965 and 1969 Acts. The State points to fragments of legislative history which purport to show that Congress was concerned only with the advertising and labeling practices of tobacco companies when it enacted the FCLAA. But the scant legislative history to which the State directs our attention is decidedly unhelpful. The plain fact remains that Congress's reports address neither the meaning of "promotion" in § 1334(b) nor the relationship between "promotion" and "advertising." In these circumstances, we must interpret "promotion" according to its ordinary meaning.

The State attempts to carve out a meaning for "promotion" that is less expansive than its apparent plain meaning, and yet conceptually distinct from "advertising." We are unpersuaded by the State's herculean efforts for it appears that the State defines "advertising" and "promotion" almost identically. We may not conflate the "advertising" and "promotion" of cigarettes; both words appear in the text of § 1334(b) and we "must give meaning to each element of the pre-emption provision." Lorillard, 121 S. Ct. at 2415. Congress added the word "promotion" to

-11-

§ 1334(b) in 1969 though the term "advertising" was already present. Conflating the terms would render the 1969 amendment nugatory, a position we cannot accept because the Supreme Court has indicated that the 1969 amendment expanded the scope of preemption under the FCLAA. See id. at 2416-17.

Third, the State suggests that our holding portends a deplorable consequence which Congress did not intend. Drawing upon an opinion of the Seventh Circuit, the State says it "cannot imagine that Congress intended the states to be without power to prohibit a cigarette company from handing out free cigarettes in an elementary school yard." Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago, 189 F.3d 633, 638 (7th Cir. 1999) (holding that a city ordinance banning certain highly-visible forms of tobacco advertising—but not promotion—is preempted). We find fault with the State's dire prediction. Our preemption holding does not disturb an entirely separate Iowa statute that would forbid a tobacco company from handing out free cigarettes in a schoolyard. Iowa Code § 453A.2(1) provides that persons "shall not sell, give, or otherwise supply any tobacco, tobacco products, or cigarettes to any person under eighteen years of age." The retailers have not challenged § 453A.2(1) in this action, and we need not decide whether it too would be preempted by the FCLAA. For a variety of practical reasons, we tend to doubt that cigarette retailers would ever challenge § 453A.2(1); in any event, "States and localities also have at their disposal other means of regulating conduct to ensure that minors do not obtain cigarettes." Lorillard, 121 S. Ct. at 2420.

III

After the district court held that the Control Act's ban on tobacco promotions was preempted by federal law, the court entered a judgment declaring § 142A.6(6) "null and void in its entirety." The judgment permanently enjoined the State from enforcing the provision or "taking any action pursuant thereto." Appellant's Add. 19.

-12-

We believe that the district court's judgment sweeps too broadly. Section 142A.6(6) prohibits retailers from conducting certain promotions of *all* tobacco products, including cigars, little cigars, pipe tobacco and chewing tobacco. See Iowa Code § 142A.2(12) (incorporating the broad definition of "tobacco products" in Iowa Code § 453A.1(26)). But the FCLAA preempts only *cigarette* promotions. Lorillard, 121 S. Ct. at 2416 ("The new pre-emption provision, like its predecessor, only applied to cigarettes, and not other tobacco products."). Thus the FCLAA does not preempt every action prohibited by § 142A.6(6) of the Control Act.

Because § 142A.6(6) is only partially preempted by federal law, we must determine whether the preempted portion may be severed from the non-preempted remainder, or whether the entire provision falls under the weight of the invalid part. "Severability is of course a matter of state law," Leavitt v. Jane L., 518 U.S. 137, 139 (1996) (per curiam), and Iowa favors severance of invalid statutory provisions. In Iowa, "there is no presumption that the legislature intends its statutes to be treated as an entirety." Clark v. Miller, 503 N.W.2d 422, 425 (Iowa 1993). "If any provision of an Act or statute or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act or statute which can be given effect without the invalid provision or application, and to this end the provisions of the Act or statute are severable." Iowa Code § 4.12.

The Supreme Court of Iowa has further clarified matters. "Severance is appropriate if it does not substantially impair the legislative purpose, if the enactment remains capable of fulfilling the apparent legislative intent, and if the remaining portion of the enactment can be given effect without the invalid provision." Am. Dog Owners Ass'n, Inc. v. City of Des Moines, 469 N.W.2d 416, 418 (Iowa 1991) (per curiam). These elements can be established in this case. The Control Act's purpose is mainly hortatory: most of the Control Act is devoted to establishing a commission to study the tobacco use phenomenon and to propose initiatives that will improve the public health. Though the preemption of § 142A.6(6) as to cigarettes slightly

damages the General Assembly's broader aspirations, we are unable to conclude that our narrow preemption holding substantially impairs the General Assembly's intentions. As the district court observed, § 142A.6(6) "is tucked into the part of the Act that sets forth the establishment, purpose, and expected results of the initiative and bears virtually no relation to the rest of the Act." Appellants' Add. 15. We perceive no logistical or legal impediment to Iowa's continued enforcement of § 142A.6(6) to the extent that it regulates tobacco products other than cigarettes.

Although the FCLAA preempts § 142A.6(6)(a)-(b) insofar as it regulates cigarette promotions, the state law is not otherwise preempted. We therefore reverse the judgment of the district court declaring the entirety of § 142A.6(6)(a)-(b) preempted, and we remand the matter for further proceedings consistent with our opinion. On remand, the retailers are free to renew their arguments that non-preempted portions of the Control Act nevertheless violate their First and Fourteenth Amendment rights.

IV

We affirm the district court's essential holding that the FCLAA preempts portions of the Control Act that prohibit retailers from selling cigarettes with the assistance of certain promotions. But we reverse in part the relief granted by the district court and remand the matter for further proceedings.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-