BOLIN, Justice
(concurring specially).
;In light of the United States Supreme Court’s decision of Obergefell v. Hodges, 576 U.S. —, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), in which a 5-4 majority declared, without any constitutional basis, that same-sex applicants have a fundamental constitutional right to marriage, I *600 concur in dismissing the “Motion for Clarification and Reaffirmation of the Court’s Orders Upholding and Enforcing Ala-bama’s Marriage Laws.” I do not agree with the majority opinion in Obergefell; however, I do concede that its holding is binding authority on this Court. See Howlett v. Rose, 496 U.S. 356, 371, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (“The Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source.”). I am nevertheless bound by my conscience to write further to express my views concerning the Obergefell majority’s lack of a legal basis for its opinion, as well as to recognize what I deem to be the possible effect of Obergefell upon Alabama’s marriage-license laws left in its wake.
Moreover, as a preliminary matter, I would like to emphasize the seemingly obvious — that this Court’s order, dismissing all pending motions and petitions in this case, is not an opinion of this Court. Rather, the order is simply a plain vanilla order of dismissal, with no accompanying explanation. A “dismissal order” or “order of dismissal” is defined as an order “ending a lawsuit without a decision on the merits.” Black’s Law Dictionary 1271 (10th ed. 2014). Whereas, an qrder of “denial” is defined as “[a] refusal or rejection; esp., á court’s refusal to grant a request presented in a motion or petition.” Black’s Law Dictionary 527 (10th ed. 2014). Although arguably the difference between “dismissed” and “denied” is sometimes as semantic (i.e., in this proceeding) as it is substantive, I would posit that the more appropriate judicial order in this proceeding would be “denied.” However, because I agree this case must end, I concur in this Court’s “dismissal.” I note also that there are six special writings attendant to this order of “dismissal.” A special writing and, more specifically, a “special concurrence,” is defined as “[a] vote cast by a judge in favor of the result reached, but on grounds different from those expressed in the opinion [if such be present] explaining the court’s judgment or in order to state views not expressed by the court.” Black’s Laiv Dictionary 352 (10th ed. 2014) (brackets added). In other words, a special concurrence is nothing more than a writing containing additional thoughts and/or commentary of the author, unless, of course, another Justice or Justices join in that special concurrence. I reiterate that of all the special writings generated by this Court’s order of dismissal, none of them, including this one, speaks the words of the Court. In this regard, I join Justice Stuart’s special writing commenting upon the same.
7. Fourieenth Amendment
As Justice Scalia said in Obergefell:
“When the Fourteenth Amendment was ratified in 1868, every State limited marriage to one man and one woman, and no one doubted the constitutionality of doing so....
“... Buried beneath the mummeries and straining-to-be-memorable passages of the opinion is a candid and startling assertion: No matter what it was the People ratified, the Fourteenth Amendment protects those rights that the Judiciary, in its ‘reasoned judgment, ’ thinks the Fourteenth Amendment ought to protect....
“... States are free to adopt whatever laws they like, even those that offend the esteemed Justices’ ‘reasoned judgment. ’ ...”
576 U.S. at -, 135 S.Ct. at 2628-29 (Scalia, J., dissenting) (footnote omitted; some emphasis added). Apparently states are not always so free, because, as Justice Scalia further expressed:
*601 “They [the majority] have discovered in the Fourteenth Amendment a ‘fundamental right’ overlooked by every person alive at the time of ratification, and almost everyone else in the time since.”
576 U.S. at -, 135 S.Ct. at 2629 (Scalia, J., dissenting).
The United States Supreme Court has stated that “the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, ‘deeply-rooted in this Nation’s history and tradition,’ and ‘implicit in the concept of ordered liberty,’ such that ‘neither liberty nor justice would exist if they were sacrificed.’ ” Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations omitted). It is without dispute that the concept of same-sex marriage is not deeply rooted in either this Nation’s or this State’s history and tradition — or frankly anywhere. To the contrary, from its earliest days, circa 1800s, Alabama has, with little modification, provided a statutory scheme for the formal licensing and recognition of marriages as being between a man and a woman. In the decision previously issued by this Court that is the subject of the motions disposed of today, the Court expounded on the genesis and historical framework of marriage:
“Laws that include the concept of marriage as the union of one man and one woman, however, predate the inception of Alabama as a state in 1819. In 1805 — when Alabama was still a part of the Mississippi Territory — the legislature of the Mississippi Territory passed an act imbuing orphans’ courts with the power to grant and issue marriage licenses. H. Toulmin, Digest of the Laws of Alabama, tit. 42, ch. 1, § 4 (1823). That act remained in force after the •creation of Alabama as a state in 1819 and contained language referring to persons joined together as ‘man and wife.’ See H. Toulmin, Digest of the Laws of Alabama, tit. 42, ch. 1, § 6 (1823). Furthermore, in 1805, the plain, ordinary, and commonly understood meaning of the word ‘marriage’ was ‘the act of joining: man and ■ woman.’ Webster, A Compendious Dictionary of the English Language, 185 (1806). Following Alabama’s becoming a state in 1819, Alabama law continued to include the concept of marriage as the union of one man and one woman. See Hunter v. Whitworth, 9 Ala. 965, 968 (1846) (‘Marriage is considered by all civilized nations as the source, of legitimacy; the qualities of husband and. m/e must be possessed by the parents in order to make the offspring legitimate, where the municipal law does not otherwise provide.’ (emphasis added)). In 1850, the Alabama Legislature conferred the power to issue marriage licenses to the newly created probate courts. 1850 Ala. Laws 26. This power was officially codified in 1852. See Ala.Code 1852, §. 1949.”
Ex parte State ex rel. Alabama Policy Inst., 200 So.3d 495, 530-31 n. 18 (Ala.2015) (“API”). Further, this Court made reference to
“the provisions of Chapter 1 of Title 30 (and their predecessors dating back 200 years) by which the legislature has provided for the affirmative licensing and recognition of ‘marriage,’ including the provision in § 30-1-9 (and its predecessors) for the licensing of ‘marriages’ and the provisions in § 30-1-7 (and its predecessors) for the solemnization of ‘marriages.’ And it is clear that the term ‘marriage’ as used in all those laws always has been, and still is (unless the courts can conjure the ability to retroactively change the meaning of a word after it has been used by the legislature), *602 a union between one man and one wom.an.”
API, 200 So.3d at 531 (emphasis added).
. I'n Alabama, in 1998 and 2006, the legislature and the people' of this State, respectively, recommitted expressly to the vital nature of the meaning of marriage in our present statutory scheme:
“Chapter 1 of Title 30, Ala.Code 1975, provides, as has its predecessor provisions throughout this State’s history, a comprehensive set of regulations governing what these statutes refer to as ‘marriage.’ See, e.g., § 30-1-7, Ala. Code 1975 (providing for the solemnization of ‘marriages’), and § 30-1-9, Ala. Code 1975 (authorizing probate judges to issue ‘marriage’ licenses). In 1998, the Alabama Legislature added to this chapter the ‘Alabama Marriage Protection Act,’ codified at § 30-1-19, Ala, Code 1975 (‘the Act’), expressly stating that ‘[mjarriage is inherently a unique relationship bet/ween a man and a woman’ and that ‘[n)o marriage license shall be issued in the State ■ of Alabama to parties of the same sex.’ § 30-l-19(b) and (d), Ala.Code 1975. In 2005,, the people of Alabama ratified [by 81 per-cent of the vote] an amendment to the Alabama Constitution known as, the ‘Sanctity of Marriage Amendment,’ § 36.03, Ala. Const. 1901 (‘the Amendment), which contains identical language, § 36.03(b) and (d), Ala. Const. 1901.”
API, 200 So.3d at 500 (emphasis added).
Clearly, the State of Alabama has exercised its sovereign authority to define marriage as being inherently that relationship between a man and a woman by the authority that has exclusively been delegated to. the states, including this State, to regulate, pursuant to the express language,in the Ninth Amendment to the United States Constitution, part of the Bill of Rights (addressing the rights, retained by the people, that are not specifically enumerated in the Constitution) and the Tenth Amendment (“The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.”). Moreover, the people of Alabama have given voice to their sovereign state authority through ratification of the Sanctity of Marriage Amendment to the Alabama Constitution by an overwhelming 81 percent vote. Justice Kennedy, writing for the majority in United States v. Windsor, 570 U.S. —, —, 133 S.Ct. 2675, 2691, 186 L.Ed.2d 808 (2013), acknowledged the above-mentioned authority when he referred to the well settled authority of each state to regulate its own laws regarding marriage and the definition of “marriage”:
“The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens. See Williams v. North Carolina, 317 U.S. 287, 298 (1942) (‘Each state as a sovereign- has a rightful and legitimate concern in the marital status of persons domiciled within its borders’). The definition of marriage is the foundation of the State’s broader authority to regulate the subject of domestic relations with respect to the ‘protection of offspring, property interests, and the enforcement of marital responsibilities. ’ Ibid. ‘[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce ... [and] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce,’ Haddock v. Haddock, 201 U.S. 562, 575 (1906); see also In re Burrus, 136 U.S. 586, 593-594 [10 S.Ct. 850, 34 L.Ed. 500] (1890) (‘The whole subject of the domestic relations of hus *603 band and wife, parent and child, belongs to the laws of the States and not to the laws of the United States’).”
(Emphasis added.) Without comment concerning, or apology regarding,- those words, only two years later the same Justice Kennedy, writing for the- majority in Obergefell, reversed course and decreed that all states are now required by the Constitution to issue marriage licenses to same-sex couples. It bears,repeating that this change of interpretation and direction came only two years after Windsor and in the words of the same Justice who authored that opinion. Although Justice Kennedy cited Windsor on six different occasions in Obergefell,- he nonetheless made no attempt to distinguish his statement in Windsor that “[b]y history and tradition the definition and regulation of marriage ... has been treated as being within the authority and realm of the separate States.” Windsor, 570 U.S. at -, 133 S.Ct. at 2689-90. Rather, the Oberge-fell majority pulled from thin (legal) air a redefinition of marriage that is based not on any fundamental right deeply rooted in this Nation’s history and tradition, but rather on its self-declared beliefs that same-sex couples should be allowed to marry because “[t]he nature of marriage is that, through its enduring bond, two persons together can find other freedoms, such as expression, intimacy, and spirituality”; “[mjarriage responds to-the universal fear that a lonely person might call out only to find no one there”; “[t]heir hope is not to be condemned to live in loneliness, excluded from one of civilization’s oldest institutions”; “[t]hey ask for equal dignity in the eyes of the law”; and “[t]he Constitution grants them that right,” 570 U.S. at -, 135 S.Ct. at 2599, 2600, and 2608. Yielding to current social mores and temporal societal policy to recognize a fundamental constitutional right in a way not intended for the judicial branch of government, the majority in Obergefell, in the last phrase quoted above, is better understood to be saying: “We simply think that the Constitution should, and hereby does, grant them that right.”
The above-stated beliefs and accompanying conclusion, properly excoriated by the four Obergefell dissenters, are legislative rather than judicial in tone and nature and, again, ignore Supreme Court precedent to reach a desired societal result, which, as noted by Justice Scalia, “diminish[es] [the] Court’s reputation for clear thinking and sober analysis.” 576 U.S. at -, 135 S.Ct. at 2630 (Scalia, J., dissenting). Rather,
“[f|or today’s majority, it does not matter that the right to same-sex marriage lacks deep roots or even that it is contrary to long-established tradition. The Justices in the majority claim the authority to confer constitutional protection upon that right simply because they believe that it is fundamental.”
576 U.S. at —, 135 S.Ct. at 2640-41 (Alito, J., dissenting) (emphasis addéd).
“Understand well what this dissent is about: It is not about whether, in my judgment, the institution of marriage should be changed to include same-sex couples. It is instead about ivhether, in our democratic republic, that decision should rest with the people acting through their elected representatives, or with five lawyers who happen to hold commissions authorizing them to resolve legal disputes according to law. The Constitution leaves no doubt about the answer.”
576 U.S. at -, 135 S.Ct. at 2612 (Roberts, C.J., dissenting)(emphasis added).
Apparently the Constitution does leave doubt. Although I have many times not agreed with a decision of the United States Supreme Court, or a decision of the Ala *604 bama Supreme Court for that matter, I have never criticized an opinion from any court in the manner in which I regrettably do so today. I am, however, able to count to five — and I know that five votes trump four; and, although that does not make it right, it does make it a majority opinion. In my humble judgment, the 5-4 majority does not make the Obergefell decision well reasoned or even based upon sound principles of established constitutional law. Rather, it only makes it binding authority for today — subject to being properly, and lawfully, reexamined and reconsidered in the future. In the meantime, it seems to me to be an opinion that defines the phrase ipse dixit — translated as meaning “he himself said it” or “[something asserted but not proved.” Black’s Law Dictionary 956 (10th ed. 2014). My translation — it is because, without foundation, they say it is.
II. Alabama Licensing Scheme — Aftermath
The foregoing being said, I am further compelled to concur specially to express my concern, which remains to be determined in future cases, that the Obergefell decision may have emasculated this State’s entire statutory licensing scheme governing “marriage” to the point of rendering it incapable of being enforced prospectively. See Chapter 1, titled “Marriage,” of Title 30, Ala.Code 1975. My concern arises because when some aspect of a law has been held to be unconstitutional, or unenforceable, due to some unforeseen practical difficulty or impossibility, or, as in this case, a judicially quickened version of the deliberative democratic process, it must be determined whether what is left can be enforced without the ineffective portion. In API, this Court acknowledged that
“the contemplated change in the definition (or ‘application’ if one insists, although this clearly misapprehends the true nature of what is occurring) of the term ‘marriage’ so as to make it mean (or apply to) something antithetical to that which was intended by the legislature and to the organic purpose of Title 30, Chapter 1, would appear to require nothing short of striking down that entire statutory scheme.”
200 So.3d at 531.
At this juncture, I express only my concern rather than my opinion because the issue of the future enforceability of Alabama’s marriage-licensing statutes is not squarely before this Court. However, as it pertains to a state statute, the United States Supreme Court has, at least currently, obseiwed that “[sjeverability [of a portion of a state statute] is of course a matter of state law.” Leavitt v. Jane L., 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (emphasis added). This Court noted in API that to
“allow the judiciary to declare by judicial fiat a new statutory scheme in place of the old, rather than leaving it to the legislative branch to decide what should take the place of the scheme being stricken, [is] contrary to well established state and federal principles of judicial review.”
200 So.3d at 531 n. 19.
The issue of severability involves a question of statutory construction, which primarily involves ascertaining and giving effect to the intent of the legislature.
“This Court addressed the standard for ascertaining severability in Newton v. City of Tuscaloosa, 251 Ala. 209, 217, 36 So.2d 487, 493 (1948):
“‘A criterion to ascertain whether or not a statute is severable so that by rejecting the bad the valid may remain intact is: The act “ought not to be held wholly void unless the invalid portion is so impoHant to the general plan and operation of the law in its *605 entirety as reasonably to lead to the conclusion that it would not have been- adopted if the legislature had perceived the invalidity of the part so held to be unconstitutional.” A. Bertolla & Sons v. State, 247 Ala. 269, 271, 24 So.2d 23, 25 [ (1945) ]; Union Bank & Trust Co. v. Blan, 229 Ala. 180, 155 So. 612 [ (1934) ]; 6 R.C.L. 125, § 123.’ ”
King v. Campbell, 988 So.2d 969, 982 (Ala.2007) (emphasis added in King). The fallout from Obergefell may present a classic example of an inability to sever the remains of our statutory licensing scheme following the imposition of the newly crafted definition of “marriage” announced by the Obergefell majority. Arguably, this result appears inescapable, because the new definitional fiat is completely contrary to what this State’s legislature has historically intended and enacted. Stated differently, Alabama’s marriage-license provisions, Chapter 1 of Title 30, Ala.Code 1975, titled “Marriage,” being the very heart and soul of our statutory licensing procedure, are dependent upon this State’s historical definition of “marriage” as a union of a man and a woman. Under the circumstances with which we are left and upon proper challenge, neither the probate judges, nor this Court, nor the other courts of this State, may have the practical ability to enforce our State licensing laws concerning the institution of marriage in the manner contemplated by our legislature and our people.

III. Conclusion

The Obergefell majority declared that the constitutional authority and process for defining marriage is no longer a matter for the states; the Obergefell majority usurped both this authority and process, knowing what was best for us — an elitist view that is extrajudicial and condescending to the states under the 9th and ÍOth Amendments and to the citizenry and this country as a whole and, by the way, to the rule of law. With regard to this elitism and condescension, Justice Scalia succinctly noted that “[t]he opinion is couched in a style that is as pretentious as its content is egotistic.” 576 U.S. at -, 135 S.Ct. at 2630 (Scalia, J., dissenting), and that,
“to allow the policy question of same-sex marriage to be considered and resolved by a select, patrician, highly unrepresented panel of nine is to violate a principle even more fundamental than no taxation without representation: no social transformation without representation. ...
“But what really astounds is the hubris reflected in today’s judicial Putsch.”
576 U.S. at -, 135 S.Ct. at 2629 (Scalia, J., dissenting).
As tempting as it would be to reenact the type defiance the State of Georgia and President Andrew Jackson espoused when Georgia refused "to comply with a Supreme Court order and President Jackson, decrying the Supreme Court and defending Georgia, purportedly stated: “[Chief Justice] John Marshall has made his decision, now let him enforce it”[31] — I cannot and *606 will not go that far in defiance, because to do so would only placate the heart at the expense of the head; and, should anyone do so, our constitutional republic would begin to cease being a nation of laws and not of men; and, finally, to do so in this case could potentially render the licensing officials, i.e., the probate judges of the State, subject to personal civil liability for following their religious beliefs. And it is arguably not hyperbole to further contemplate that it could place those same licensing officials in the middle of an end-game stand-off with federal marshals and/or federalized national guardsmen on one side, with a contempt order from a federal court in hand, and state law-enforcement officers on the other, with a competing and conflicting state court order in hand. We havé already had one war with kinsmen fighting kinsmen. We do not need another. Rather, we need to see that review of this wrong decision is done the right way — by constitutional means; otherwise, we would be in the same position as Chief Justice Roberts when he stated in the Obergefell decision: “Just who do we think we are?” 576 U.S. at -, 135 S.Ct. at 2612 (Roberts, C.J., dissenting). In this regard, I join that portion of Part II of Justice Shaw’s well reasoned special writing concerning defiance.
As respectfully as I can, albeit reluctantly, I concur in dismissing the petitioners’ motions, and I further concur specially to note that the process of licensing of marriages in Alabama as we have known it may have been irreparably broken.

. President Jackson's confrontation with the Supreme Court resulted from that court's holding unconstitutional a Georgia statute that allowed non-Indians to live among Indians only if they got a license to do so and swore an oath of loyalty to the State of Georgia. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 577-78, 8 L.Ed. 483 (1832). Samuel Worcester, a white northern missionary, was convicted because he refused to do either. The Supreme Court held the Georgia statute unconstitutional, overturned Worcester’s conviction, and ordered Georgia to release him. Georgia refused to do so. Tradition has it that President Jackson declared: "John Marshall has made his decision, now let him enforce it.” Amy Coney Barrett, Symposium Stare Decisis and Nonjudicial Actors, 83 Notre *606 Dame L.Rev. 1147, 1154 (2008). "Jackson was saved from a direct collision with the Court by the fact that he appeared to lack the authority to act. Timing and a procedural quirk had prevented the Supreme Court from dispatching the federal marshal to execute the judgment, and a federal statute authorized the President to intervene only if the marshal failed.” 83 Notre Dame L.Rev. at 1155.