# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-3198

_____

Cellco Partnership, doing business as &ast;
Verizon Wireless; Verizon Wireless, &ast;
doing business as Verizon Wireless, &ast;
(VAW) L.L.C.; Duluth MSA, doing &ast;
business as Verizon Wireless, Limited &ast;
Partnership; Midwest Wireless Holdings,&ast;
L.L.C.; Midwest Wireless &ast;
Communications, L.L.C.; American &ast;
Cellular Corporation; Rural Cellular &ast;
Corporation, doing business as Cellular &ast;
 2000; Sprint Spectrum L.P.; AT&T &ast;
Wireless Services of Minnesota, &ast;
Inc.; Voicestream Minneapolis, Inc.; &ast;
T-Mobile USA, Inc., &ast;
 &ast;
       Appellants, &ast;
 &ast;  Appeal from the United States
     v. &ast;  District Court for the
 &ast;  District of Minnesota.
Mike Hatch, in his official capacity as &ast;
Attorney General of Minnesota and not &ast;
as an individual, &ast;
 &ast;
       Appellee. &ast;
 &ast;
 &ast;
_____ &ast;
 &ast;
Cellular Telecommunications & &ast;
Internet Association; Federal &ast;
Communications Commission, &ast;
 &ast;
     Amici on Behalf of Appellant, &ast;

AARP; National Association of State          *
Utility Consumer Advocates;                  *
National Association of Consumer             *
Advocates,                                   *
                                             *
    Amici on Behalf of Appellee.          *

_____

Submitted:  May 11, 2005
Filed:  December 9, 2005

_____

Before WOLLMAN, BYE, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Cellco Partnership and its co-appellants (collectively, "Cellco") appeal from the district court's partial denial of their request for a preliminary injunction against implementation and enforcement of Minnesota Statutes § 325F.695 ("Article 5").[1] The district court ruled that Cellco's claims – that Article 5 was preempted and that the statute was unconstitutionally vague – did not have a likelihood of success on the merits, and dissolved the temporary restraining order it had previously entered. We reverse and remand for entry of a permanent injunction.

---

[1]The district court granted Cellco's request for a preliminary injunction barring Attorney General Hatch and employees of the State from "taking any action to prevent wireless communications providers from passing through to customers federally assessed fees," pursuant to its determination that Article 5 conflicted with 47 C.F.R. § 54.712(a), which authorized recovery of the fees. This portion of the district court's order is not challenged on appeal.

I.

On May 29, 2004, the Governor of Minnesota signed into law Article 5 of House File No. 2151, entitled "Wireless Consumer Protection." Article 5 imposes several requirements on Cellco and other providers of wireless telecommunications services. The statute forbids the providers to implement changes in the terms and conditions of subscriber contracts that "could result" in increased rates or an extended contract term, unless they first obtain affirmative written or oral consent from the subscriber. Minn. Stat. § 325F.695, subd. 3; *see id*. § 325F.695, subd. 1(d). Article 5 also requires providers to deliver copies of the subscriber contracts to the subscribers, *id.*, subd. 2, and, in the event a subscriber proposes a change to the contract, to disclose clearly any rate increase or contract extension that could result from the change. *Id*., subd. 4. The statute further requires providers to maintain recorded or electronic verification of the "disclosures" required by the law. Article 5 was scheduled to take effect on July 1, 2004, but on June 16, Cellco filed suit in the District of Minnesota seeking a declaration that, among other things, Article 5 was preempted by the Communications Act of 1934, 47 U.S.C. §§ 151-614, and invalid under several provisions of the United States Constitution. Cellco also sought an injunction against enforcement of Article 5.

The district court first granted a temporary restraining order against enforcement of Article 5, ruling that Cellco had "shown an initial likelihood of success on at least a portion of [its] preemption argument." (Add. at 24). On consideration of Cellco's request for a preliminary injunction, however, the court reached a different conclusion. The district court concluded that Cellco had not satisfied the standard for preliminary injunctions set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc), with respect to its claim that Article 5 is preempted, except to the extent that Article 5 applied to Cellco's attempts to pass along the costs of contributions to the Universal Service Fund pursuant to 47 C.F.R. § 54.712(a). The district court also determined that Cellco did

not meet the *Dataphase* test with respect to its claim that Article 5 is unconstitutionally vague. As a result, the district court dissolved its temporary restraining order effective September 15, 2004. We granted a stay pending appeal.

Although the district court analyzed the preemption question under the "likelihood of success on the merits" prong of the test for granting preliminary injunctions, *see Dataphase*, 640 F.2d at 113, Cellco now proposes without objection from the State that there are only legal issues unresolved on appeal. Accordingly, we consider Cellco's motion as one for a permanent injunction. *See Bank One v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).

II.

Cellco urges that Article 5 is expressly preempted by a federal statute, § 332(c)(3)(A) of the Communications Act of 1934, which provides in relevant part:

> [N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.

47 U.S.C. § 332(c)(3)(A). A "mobile service" is defined as a "radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves," *id.* § 153(27); *see id.* § 332(d), and it is undisputed that Cellco is a commercial mobile service ("CMRS" or "provider"). The parties also agree that Article 5 does not regulate market entry, so whether any part of Article 5 is expressly preempted by § 332(c)(3)(A) turns on whether the statute regulates "rates charged" by providers. Our interpretation of the scope of an express preemption clause "must rest primarily on a fair understanding of congressional purpose," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996)

-4-

(internal quotation and emphasis omitted), and we presume that Congress does not intend preemption of historic police powers of the States "unless that was [its] clear and manifest purpose." *Id*. at 485.

Section 332(c)(3) was added to the Communications Act in 1982, *see* An Act to amend the Communications Act of 1934, Pub. L. No. 97-259, § 120(a), 96 Stat. 1087, 1096 (1982), and its original preemption language provided that "[n]o State or local government shall have any authority to impose any rate or entry regulation upon any private land mobile service, except that nothing in this subsection may be construed to impair such jurisdiction with respect to common carrier stations in the mobile service." 47 U.S.C. § 332(c)(3) (1992). An amendment in 1993 gave § 332(c)(3)(A) its current form, introducing the commercial/private mobile service distinction and providing for state regulation of "other terms and conditions." *See* Omnibus Reconciliation Act of 1993, Pub. L. No. 103-66, § 6002, 107 Stat. 312, 394 (1993).

The legislative history of the 1993 amendment speaks only briefly and indirectly about the meaning of "rate" regulation. A report from the House Budget Committee elaborated on the meaning of "other terms and conditions," which the statute distinguishes from the regulation of "rates" and "market entry":

> By "terms and conditions," the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (*e.g.,* zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions."

H.R. Rep. No. 103-111, at 261 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 588.

As the agency charged with administering the Communications Act, *see* 47 U.S.C. § 151, the FCC has interpreted § 332(c)(3)(A) on several occasions, often relying on the aforementioned legislative history.[2]  The FCC has determined that a State's review of the rates charged by providers prior to implementation of the rates, where the review often occasioned delays of 30 days before new rate offerings could take effect, is "rate regulation" for purposes of § 332(c)(3)(A). *Pet. on Behalf of the State of Hawaii*, *Pub. Util. Comm'n*, 10 F.C.C.R. 7872, 7882 (1995).  The Commission also has ruled that regulation of rates includes regulation of "rate levels and rate structures," such as whether to charge for calls in whole-minute increments and whether to charge for both incoming and outgoing calls, and that States are prohibited from prescribing "the rate elements for CMRS" and from "specify[ing] which among the CMRS services provided can be subject to charges by CMRS providers." *Southwestern Bell Mobile Sys., Inc.*, 14 F.C.C.R. 19898, 19907 (1999).

---

[2]The FCC has filed an amicus brief in this case asserting that Article 5 is preempted by § 332(c)(3)(A) because Article 5 is not a "generally applicable" state contract or consumer fraud law.  Cellco urges us to accord "some" deference to the FCC's litigating position, citing the Supreme Court's grant of deference to an agency's amicus brief where there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *See Auer v. Robbins*, 519 U.S. 452, 462 (1997).  We note, however, that the FCC is in the midst of a rulemaking process designed to consider the merits of a rule similar to that espoused in the amicus brief. *See Truth-in-Billing & Billing Format*, 20 F.C.C.R. 6448, 6475-76 (2005) (second report and order, declaratory ruling, and second further notice of proposed rulemaking).  The agency's position thus appears somewhat fluid, and perhaps short of "considered judgment." *See id.* at 6476 ("[W]e *tentatively* conclude that the line between the Commission's jurisdiction and states' jurisdiction over carriers' billing practices is properly drawn to where states only may enforce their own generally applicable contractual and consumer protection laws, albeit as they apply to carriers' billing practices.") (emphasis added). In any event, because our consideration of the FCC's previous adjudications and our interpretation of § 332(c)(3)(A) independently lead to our conclusion, we need not decide whether deference to the FCC's position in its brief is appropriate here.

In light of the legislative history classifying billing information, practices, and disputes as "other terms and conditions," however, the FCC has concluded that "state law claims stemming from state contract or consumer fraud laws governing disclosure of rates and rate practices are not generally preempted under Section 332." *Id.* at 19908. The FCC later clarified that while § 332(c)(3) "does not generally preempt the award of monetary damages by state courts based on state consumer protection, tort, or contract claims[,] . . . whether a specific damage calculation is prohibited by Section 332 will depend on the specific details of the award and the facts and circumstances of a particular case." *Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 17022 (2000). In reaching that conclusion, the Commission noted that the "indirect and uncertain effects" of damage awards pursuant to state contract and tort law are not the same as the effects of direct rate regulation, and that although such awards may increase the costs of doing business, these costs "fall no more heavily on CMRS providers than on any other business." *Id.* at 17034-35 (internal quotation omitted).

Cellco focuses its preemption arguments primarily on subdivision 3 of the Minnesota statute. Subdivision 3 is entitled "Provider-initiated substantive change," and it mandates that providers

> must notify the customer in writing of any proposed substantive change in the contract between the provider and the customer 60 days before the change is proposed to take effect. The change only becomes effective if the customer opts in to the change by affirmatively accepting the change prior to the proposed effective date in writing or by oral authorization which is recorded by the provider and maintained for the duration of the contract period. If the customer does not affirmatively opt in to accept the proposed substantive change, then the original contract terms shall apply.

Minn. Stat. § 325F.695, subd. 3.  A "substantive change" is defined in relevant part as "a modification to, or addition or deletion of, a term or condition in a contract that could result in an increase in the charge to the customer under that contract or that could result in an extension of the term of that contract."  *Id*. § 325F.695, subd. 1(d).

We agree with the FCC that "fixing rates of . . . providers" is rate regulation, *see Pet. of Pittencrieff Communications, Inc.*, 13 F.C.C.R. 1735, 1745 (1997), and we conclude that subdivision 3 of the Minnesota statute constitutes impermissible rate regulation preempted by federal law.  The requirement of subdivision 3 that consumers consent to any substantive change prevents providers from raising rates for a period of time, and thus fixes the rates.  The 60-day notification period created by subdivision 3 effectively freezes rates for 60 days when the provider notifies a customer of a proposed change in rates.  The State's position – that Article 5 imposes only a "window within which the customer has to decide whether or not to accept a change proposed by the wireless provider," and that rate changes could go into effect immediately upon the consumer's consent – strikes us as inconsistent with the plain meaning of the text of the statute.  Subdivision 3 requires that providers notify customers of "any proposed substantive change . . . 60 days before the change is proposed to take effect," and this change may take effect only if the customer "opts in" before "the proposed effective date."  Minn. Stat. § 325F.695, subd. 3.  A proposed change thus must include a proposed effective date, and modification of the "effective date" is not contemplated by the statute.

But even accepting the State's interpretation, under which rates may be changed as soon as a customer manifests assent, the statute still fixes rates for at least some customers to some degree.  If even one customer declines to "opt in" to a provider's proposed rate increase, then the rate for that customer's service would be fixed for the term of the existing contract, often one or two years.  Even assuming, *arguendo* (and contrary to our experience with human nature), that all consumers would willingly accept rate hikes when proposed, and thus "opt in" before the expiration of the 60-day

period, subdivision 3 indisputably freezes rates for *some* period – at least until the consumer manifests acceptance. The statute thus requires providers to maintain rates different from those that would be charged if the providers were left to follow the terms of their existing contracts, which typically allow an adjustment of rates after reasonable notice of fewer than 60 days. (J.A. at 146, 149).

The State argues that subdivision 3 is a consumer protection measure that "further[s] the underlying traditional requirements of contract law as a way to protect consumer interests" by guarding consumers against unilateral contract changes. "Consumer protection matters," it notes, were among the matters listed by the House Budget Committee as illustrative of "terms and conditions" that would be open to state regulation under § 332(c)(3)(A). H.R. Rep. No. 103-11, at 261. We find this argument overbroad, and we are not persuaded. Any measure that benefits consumers, including legislation that restricts rate increases, can be said in some sense to serve as a "consumer protection measure," but a benefit to consumers, standing alone, is plainly not sufficient to place a state regulation on the permissible side of the federal/state regulatory line drawn by § 332(c)(3)(A). To avoid subsuming the regulation of rates within the governance of "terms and conditions," the meaning of "consumer protection" in this context must exclude regulatory measures, such as Article 5, that directly impact the rates charged by providers.

Subdivision 3, moreover, goes beyond traditional requirements of contract law, and thus falls outside the scope of the "neutral application of state contractual or consumer fraud laws," which the FCC has said is permissible state regulation of wireless providers. This statute effectively voids the terms of contracts currently used by providers in one industry, and substitutes by statute a different contractual arrangement. The existing contracts exemplify an "opt-out" structure – that is, they permit the providers to effect rate increases upon reasonable notice to the customer, whose continued use of the service binds him to the new rate unless he affirmatively declines to accept the changes. (J.A. at 149). Subdivision 3 mandates an "opt-in"

-9-

contract structure: the provider cannot increase rates unless the customer affirmatively accepts the changes. The State contends that the current structure used by the providers renders the contracts "illusory," because it permits the providers "unilateral[ly]" to "change the contract's terms," (Appellee's Br. at 33), but we are not convinced. There is no indication that "opt-out" contracts of the sort used by the providers are considered illusory under Minnesota's consumer protection statutes or its common law, and in fact, such contracts are generally accepted as legal and binding. *See Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 173-74 (5th Cir. 2004); *cf. Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn. 1983) (declaring enforceable the acceptance, by continued performance, of modification in a unilateral contract for employment). Subdivision 3, therefore, cannot be deemed a "neutral application of state contractual or consumer fraud laws" that avoids the preemptive force of the federal statute. *See Wireless Consumers Alliance*, 15 F.C.C.R. at 17025-06. A waiting period on any proposed rate changes, whether it be for 60 days or some shorter period pending a customer's decision to "opt in," has a clear and direct effect on rates. We thus conclude that subdivision 3 effectively regulates rates, and is preempted by § 332(c)(3)(A).

### III.

There remains the question whether the other subdivisions of Article 5 may be enforced independent of subdivision 3. Whether one provision of a statute is severable from the remainder is a question of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). In Minnesota, the remaining provisions of a statute shall be valid, "unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one," or "unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." Minn. Stat. § 645.20. To give these clauses independent

-10-

meaning, we understand the former clause to forbid severance in cases where the remaining provisions are *not* incomplete or incapable of being executed, but where the interrelationship of the void and non-void provisions nonetheless precludes the presumption that the legislature would have enacted only the latter provision. *See Archer Daniels Midland Co. v. State*, 315 N.W.2d 597, 600 (Minn. 1982) (concluding remaining provisions of statute, standing alone, were not severable, where legislative intent to prefer limited application of statute was "not at all clear."); *Bang v. Chase*, 442 F. Supp. 758, 771 (D. Minn. 1977) (three-judge court).

We believe that the remaining subdivisions of Article 5 – a definitional section, a provision requiring wireless providers to furnish customers with a copy of written contracts, and a subdivision regulating "customer-initiated changes" – are connected with and dependent upon subdivision 3. The legislative history shows that subdivision 3 was the motivating force behind Article 5. The principal Senate sponsor, for example, explained that "the reason for the genesis of this bill . . . is people in our area were contacting our local representative . . . and telling him that their contracts were being changed without their consent." (J.A. 361).

The three substantive subdivisions were then conceived together as a unified effort to regulate certain practices of wireless telecommunications service providers. The requirement of subdivision 2 that providers furnish customers with a written copy of *existing* contracts serves as foundation for the later subdivisions, which require disclosure of proposed changes to those existing contracts. As the principal House sponsor explained, "keep in mind we are just doing two things: One) we want to verify in the records that the customer did agree to a contract in the first place and two) if a unilateral change is made in that contract by the provider, the customer is off the hook." (J.A. 384). Subdivisions 3 and 4 work in tandem as requirements for consent and disclosure, depending on whether a change in contractual terms is "provider-initiated" or "customer-initiated."

-11-

The legislature recognized that the regulatory provisions would place a burden on the industry, and potentially would raise costs for consumers. The principal House sponsor remarked that depending on how the legislation was crafted, "[i]t could turn into something that ends up costing everybody more money and it does kind of complicate the whole process." (J.A. 383). The legislature ultimately concluded that the expected benefits to the consumer outweighed concerns about costs to providers and the system, but it enacted a two-year sunset provision, so, as one representative put it, "we can all reevaluate whether or not that is cumbersome or not, or if it works as well as many think it may work." (J.A. 396; *see also* J.A. 387). "Provider-initiated" substantive changes were central to the development of Article 5, and we find it difficult to presume that the legislature would have enacted the two remaining substantive provisions standing alone, with their attendant costs to the system, if it had been precluded at the outset from regulating in the area of principal concern and perceived benefit to consumers – that is, provider-initiated changes. It also bears noting that one senator active in the legislative process surrounding Article 5 commented on the "complexities of all the moving pieces" in the proposed legislation, and on the need to ensure that each of the "multiple moving pieces" fit together in a final bill. (J.A. 394).

We conclude, therefore, that subdivisions 1, 2, and 4 are not severable from subdivision 3, and that Article 5 should be enjoined in its entirety. The remaining articles of House File No. 2151 operate independently, and they remain valid. This conclusion makes it unnecessary for us to consider Cellco's contentions that subdivisions 1, 2 and 4 of Article 5 are unconstitutionally vague, because the subdivisions fail to define such important statutory terms as "customer" and "disclosure," and because the statute defines "substantive change" indefinitely as any modification of contract that "could result" in an increase in charges. *See Planned Parenthood of Idaho v. Wasden*, 378 F.3d 908, 937 (9th Cir. 2004). If and when the legislature revisits this area, it will be in a position to consider whether more precise definitions are appropriate.

-12-

\* \* \*

For the foregoing reasons, we reverse the district court's partial denial of Cellco's request for a preliminary injunction and remand for entry of a permanent injunction against enforcement of Article 5.

———————————————————