NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

JAN 31 2023

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NATIONAL LIFELINE ASSOCIATION, | No. 21-15969 |
| Plaintiff-Appellee, | D.C. No. 3:20-cv-08312-MMC |
| v. | |
| MARYBEL BATJER, in her official capacity as a commissioner of the California Public Utilities Commission; et al., | MEMORANDUM* |
| Defendants-Appellants. | |

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted May 13, 2022
San Francisco, California

Before: MURGUIA, Chief Judge, BUMATAY, Circuit Judge, and BAKER,**
International Trade Judge.
Concurrence by Judge BAKER.

The California Public Utilities Commission ("CPUC") administers the

California LifeLine Program—a state universal service program intended to ensure

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable M. Miller Baker, International Trade Judge for the United States Court of International Trade, sitting by designation.

access to affordable communication services (like cell-phone services) for low-income Californians. California LifeLine subsidizes costs for participating wireless carriers, which include members of the National LifeLine Association ("NLA"), an industry trade association and the Plaintiff in this case. In 2020, the CPUC implemented a new rule that California LifeLine members were precluded from charging low-income customers a co-pay for two affordable wireless plans. NLA sued certain CPUC Commissioners (the Defendants), arguing that the inability to charge a co-pay meant that the rule was preempted by federal law. After NLA moved for judgment on the pleadings, the district court agreed and issued a permanent injunction enjoining the CPUC from enforcing certain changes to California LifeLine. The Defendants appealed.

We have jurisdiction under 28 U.S.C. § 1291 and reverse the district court's order granting NLA's motion for judgment on the pleadings.

Congress charged the Federal Communications Commission ("FCC") with advancing "universal service": making high-quality communication services available nationwide "at just, reasonable, and affordable rates," and offering these services to "low-income consumers." 47 U.S.C. § 254(b)(1), (b)(3); *see* 47 U.S.C. § 151. Under this system, the FCC runs a federal universal service fund that provides subsidies to service providers offering affordable plans to low-income consumers. *See* 47 C.F.R. §§ 54.401, 54.403(a). Likewise, states can establish

their own universal service funds, so long as these state programs do not conflict with FCC rules or the FCC's universal service program, *see* 47 U.S.C. § 254(f), and are not preempted by the Communications Act of 1934, *see* 47 U.S.C. § 332(c)(3)(A).

California LifeLine is one such state universal service program that subsidizes service providers to deliver high-quality communication services at affordable rates to low-income citizens. *See* Cal. Pub. Util. Code § 871.7(a). The California legislature has authorized the CPUC to oversee California LifeLine, including setting subsidy amounts and establishing eligibility requirements for participating members. *Id*. § 873. In 2020, after Governor Gavin Newsom proclaimed a State of Emergency in response to the COVID-19 pandemic, the CPUC commenced a rulemaking process to determine whether to adjust California LifeLine's subsidy amounts and eligibility criteria to "meet [California LifeLine participants] distance learning, telehealth and other essential needs."

In October 2020, after soliciting feedback from service providers, including NLA, the CPUC increased mobile service plan requirements without a corresponding increase in the subsidy amount. The CPUC thereby created four tiered wireless plans that participating service providers could offer, including the two affordable plans at issue here: (Tier 1) a "Basic Plan" of unlimited voice/text and 4 GB of broadband with a $12.85 subsidy; and (Tier 2) a "Standard Plan" of

3

unlimited voice/texts and 6 GB of broadband with a $14.85 subsidy. Under the CPUC's rule, to be eligible for a subsidy, a wireless service provider would need to provide either the Basic Plan or the Standard Plan without a co-pay (the "2020 Rule").[1] Providers, however, could charge a co-pay for the other two plans (Tiers 3 & 4) conditioned on the CPUC's approval that the co-pays were affordable. The CPUC adopted this rule for one year, running from December 1, 2020, through November 30, 2021. During the rulemaking process, NLA protested that the subsidies would not cover the cost of the plans if they could not charge co-pays. The CPUC nonetheless adopted the 2020 Rule.

NLA sued the Defendants, seeking: (i) a declaratory judgment that the 2020 Rule is preempted by § 332(c)(3)(A) of the Communications Act; and (ii) a permanent injunction enjoining the Defendants from enforcing the 2020 Rule. After NLA moved for judgment on the pleadings, the district court granted NLA's motion, concluding that the rule was preempted, and enjoined the Defendants from enforcing the 2020 Rule.

1.     Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's

---

[1] The parties also refer to the 2020 Rule as the "Free Rate Rule" or the "Subsidy Rule."

4

pleadings as true, the moving party is entitled to judgment as a matter of law." *Fajardo v. Cnty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999). Because NLA moved for judgment on the pleadings, this court looks to the allegations in the Defendants' pleadings, here their answer. *See id.* An order granting a motion for judgment on the pleadings is reviewed de novo. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). Questions of law, including preemption, are also reviewed de novo. *Toumajian v. Frailey*, 135 F.3d 648, 652 (9th Cir. 1998).

2. The Defendants argue that NLA does not have standing. An association has standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to the organization's purposes," and (3) "neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 908 (9th Cir. 2020). The parties only dispute whether NLA has satisfied the first prong. A NLA member has standing if it can show an "injury in fact," causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As a preliminary matter, "a plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful . . . ." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (citing *Lujan*, 504 U.S. at 561–62). Here, NLA

5

alleges, and the Defendants do not meaningfully dispute, that some of its members participate in California LifeLine and therefore are the object of the 2020 Rule.[2] Even if being the object of the 2020 Rule is insufficient to establish standing, NLA alleged in its complaint and substantiated with exhibits, that two of its members submitted advice letters to the CPUC seeking to charge their California LifeLine customers copays despite the 2020 Rule. However, the CPUC rejected these proposals. Therefore, at least some of NLA members' pricing plans were impacted by the 2020 Rule. Similarly, NLA alleges, and the Defendants do not deny, that before the 2020 Rule, some NLA members were offering 3 GB plans at no cost to subscribers in exchange for California LifeLine's $14.85 subsidy. Under the 2020 Rule, however, providers are required to offer 6 GB of data in exchange for the same $14.85 subsidy. Having to provide additional data without an increased subsidy imposes a concrete injury sufficient to confer standing. *See Lujan*, 504 U.S. at 561–62.[3]

---

[2] Although the Defendants deny the allegation that NLA members "'will be' subject to the [2020 Rule] because there is no requirement that wireless providers participate in the California LifeLine program," the Defendants do not deny that some NLA members currently participate in California Lifeline. Continued participation in California LifeLine requires compliance with the 2020 Rule.

[3] The Concurrence also argues that the case is moot because the 2020 Rule has expired. *See* Concurrence at 8–9. The capable of repetition yet evading review mootness exception applies to this case. This "exception is limited to extraordinary cases where '(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again.'" *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854–55 (9th Cir. 1999) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir. 1992)). Because the 2020 Rule was set to be enforced for only a year, the

3.     Turning to the merits, the district court concluded that the 2020 Rule was preempted by 47 U.S.C. § 332(c)(3)(A). A state law is preempted, and "must yield to the law of Congress," when the "state law, in its application to a particular case, comes into collision with an act of Congress." *MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1117 (9th Cir. 2020) (cleaned up). *See* U.S. Const. art. VI, cl. 2. "[A] 'clear and manifest purpose' of pre-emption is always required." *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988). Federal schemes that permit state participation "rais[e] the strong inference that Congress did not intend" to preempt state action. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 959 F.3d 1201, 1225 (9th Cir. 2020).

Here, Congress has created a coordinate system by permitting states to "adopt regulations not inconsistent with the [FCC's] rules to preserve and advance universal service," including through programs that subsidize service for low-income consumers. 47 U.S.C. § 254(f). *See also MetroPCS California, LLC*, 970 F.3d at 1119 (setting "a higher [preemption] threshold" where Congress

first prong is satisfied. Second, given that the CPUC can review and renew its regulations on an annual basis, there is a reasonable expectation NLA will be subjected to the 2020 Rule, or a similar rule, in the future. *Cf. MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1116 (9th Cir. 2020) (concluding that legislation that expired was not moot as "a case challenging expired legislation remains justiciable when the litigant still needs the judicial protection that it sought") (cleaned up). The Concurrence argues that the CPUC effectively denied this allegation is its Answer, but there, the CPUC only denied that NLA members "will be" subject to the 2020 Rule, not that there was no reasonable expectation of a future rule.

"recognizes state authority"). As part of this system, however, Congress has also explicitly preempted certain state laws. The first sentence of the "State preemption" subsection in the Communications Act provides that "no State . . . shall have any authority to regulate . . . the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A).[4] However, § 332(c)(3)(A) "leaves its key terms undefined. It never states what constitutes rate and entry regulation or what comprises other terms and conditions of wireless service." *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1056 (9th Cir. 2008) (citation omitted). This case therefore asks whether the 2020 Rule's requirement that California LifeLine members offer certain affordable plans with $0 co-pay is permissible under § 254 to advance universal service or if it impermissibly "regulate[s] . . . the rates charged" for wireless services under § 332(c)(3)(A).

California is not engaged in rate regulation within the meaning of § 332(c)(3)(A) because service providers may leave and set their own rates if they

---

[4] The second and third sentences of § 332(c)(3)(A) provide additional exceptions not applicable here. The FCC filed an amicus brief explaining that § 332(c)(3)(A)'s second sentence "exempts from preemption certain state requirements—including rate regulations—once wireless service 'has become vital to universal service.'" The FCC refers to this as the *Pittencrieff* interpretation or the "universal service exception," named after an FCC case articulating this statutory construction. *See* 13 F.C.C. Rcd. 1735, 1748 ¶ 25 (1997). Arguably this exception could apply to the 2020 Rule, but the parties did not litigate the exception before the district court, and the FCC and the parties ask that this court not rule on its applicability on appeal.

8

do not wish to comply with the California LifeLine's subsidy requirements. The 2020 Rule sets requirements for voluntary participation in California LifeLine to advance universal service.[5] Under the CPUC's rules, "[w]ireless service providers are encouraged, but not required to, offer LifeLine," and providers interested in becoming a California LifeLine member must file an advice letter demonstrating that their services comply with the California LifeLine eligibility requirements. *Decision Adopting Revisions to Modernize and Expand the Cal. LifeLine Program*, CPUC, D.14-01-036 at 3, 31–32 (Jan. 16, 2014). The 2020 Rule's co-pay requirements are part of those eligibility conditions. Service providers can withdraw from California LifeLine at any time so long as they give a thirty-day notice to customers and fulfill existing contractual obligations. *See* D.14-01-036 at 163; *see also* 47 C.F.R. § 54.205.[6] Outside of California LifeLine, service

---

[5] NLA alleged in its Complaint that California LifeLine is voluntary, and the parties stipulated that the dispute was "strictly legal in nature" and did not require discovery. However, in response to the FCC's amicus brief, NLA argues for the first time that "[t]wo of the largest wireless carriers in the country are legally obligated to keep participating in California LifeLine . . . ." Any fact not pled in a complaint but raised for the first time on appeal is inappropriate to consider when assessing a motion for judgment on the pleadings. *See* Fed. R. Civ. P. 12(c). At most, NLA demonstrates a genuine dispute as to a material fact, which does not help NLA at this posture.

      Even considering the assertions from NLA and amicus CTIA that T-Mobile is required to participate indefinitely and that Verizon is required to participate for at least twenty years, these allegations still do not amount to impermissible state rate regulation. T-Mobile voluntarily agreed to this commitment as a condition to regulatory approval of a merger, and Verizon's obligation also arose from regulatory approval of a merger. In any event, the record does not reflect that Verizon or T-Mobile are members of NLA; and thus are not party to this suit.

      [6] NLA and amicus CTIA argue that California LifeLine's thirty-day notice requirement is

providers can set their own wireless service rates as long as they comply with

applicable federal law. *See* 47 U.S.C. §§ 201 et seq.

Accordingly, the 2020 Rule does not require all California service providers

to offer certain services to consumers at specific rates; the rule applies only to

those that desire a state subsidy. That some NLA members might lose money

providing affordable plans to low-income consumers because they cannot charge a

co-pay for certain plans is of no moment under § 332(c)(3)(A): service providers

may forgo the state subsidy and set their own rates if they do not wish to comply

with the 2020 Rule's eligibility conditions. The rule therefore does not directly

control—and thus does not impermissibly regulate—the rates that providers may

set. *See Peck*, 535 F.3d at 1057 (noting no rate regulation where a state statute

allowed a carrier to "remain[] free to charge its customers as much, or as little, as

the market will bear"); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498

F.3d 1031, 1040–47 (9th Cir. 2007) (citing *N. Illinois Chapter of Associated*

---

preempted rate regulation, relying on *Cellco Partnership v. Hatch*, for the proposition that "'freez[ing] rates for some period' of time . . . is the very definition of rate regulation." 431 F.3d 1077, 1082 (8th Cir. 2005). *Cellco Partnership*'s reasoning does not hold here, because that case did not deal with a voluntary state subsidy program, but rather a wireless consumer protection law that required *all* service providers to implement certain changes. *Id.* at 1079, 1082. Unlike the statewide law in *Cellco Partnership*, the 2020 Rule does not regulate the conduct of all California service providers, but only those voluntarily participating in California LifeLine. Moreover, the 2020 Rule does not freeze rates, because participating service providers, including NLA members, had the opportunity to opt out *before* the 2020 Rule's thirty-day notice requirement took effect as the rule directed "a wireless provider" to file an advice letter for any plan "it seeks to offer."

*Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("The question 'is a condition on the receipt of a grant a form of regulation?' comes up frequently, and the answer almost always is negative.")).

Furthermore, given the presumption that "express preemption statutory provisions should be given a narrow interpretation," NLA's argument that § 332(c)(3)(A) contains no explicit voluntary participation exception fails, because the statute need not carve out every exception. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,* 410 F.3d 492, 496 (9th Cir. 2005). Reading the preemption provision narrowly so as not to implicate many forms of state action is particularly appropriate in an area where Congress created a coordinate system of regulation, and where there is a "history of state regulation [that] requires [this court] to apply the presumption against preemption." *MetroPCS California, LLC*, 970 F.3d at 1119 ("States traditionally 'exercised broad power to regulate telecommunications markets within their borders in ways that were designed to promote . . . universal service.'") (quoting *In re Public Utility Commission of Texas*, 13 F.C.C. Rcd. 3460, 3463 (1997)). And as the FCC explains in its amicus brief, the 2020 Rule is not an end-run around § 332(c)(3)(A)'s prohibition on rate regulation, because under "California's LifeLine rules, the $0 copayment requirement does not control anything except California's own expenditures." California has the discretion to subsidize only

11

plans that advance its statutory interest in offering "high-quality basic telephone service at affordable rates to the greatest number of California residents . . . by making residential service affordable to low-income citizens." Cal. Pub. Util. Code § 871.7(a). *Cf. S. Dakota v. Dole*, 483 U.S. 203, 212 (1987).

Accordingly, on NLA's motion for judgment on the pleadings, the 2020 Rule's $0 co-pay requirement for certain affordable plans is not rate regulation preempted by § 332(c)(3)(A), because participation in California LifeLine is voluntary and service providers remain free to opt out and charge whatever rates they deem appropriate.

**REVERSED** and **REMANDED.**

*Nat'l Lifeline Ass'n v. Batjer*, No. 21-15969

BAKER, Judge, concurring in the judgment:

I concur in reversing the district court but reach that conclusion for different reasons than my colleagues. In my view, we should reverse because the National Lifeline Association failed to demonstrate constitutional standing. In any event, because the challenged policy has lapsed and there is no basis on this most peculiar record for inferring any continuing controversy, this case is moot.

I

For decades, California has subsidized telephone service to low-income residents through its LifeLine program administered by the California Public Utilities Commission. Beginning in 2014, the Commission permitted—but did not require—wireless service providers to participate in the program. Under this program, participating wireless providers agreeing to the Commission's terms and conditions received state subsidies. Those terms and conditions allowed participating providers to charge copayments to subscribers in all tiers of service.

In October 2020, the Commission modified the LifeLine program for a one-year period (effective December 1, 2020, through November 30, 2021) to prohibit participating providers from charging copays to subscribers in the two lowest tiers of service.[1] Like the majority, I refer to this as the "2020 Rule."

---

[1] The Commission's order further provided that "[b]efore December 1, 2021, we must revisit these issues to establish tiers for the following year."

On November 24, 2020, the National Lifeline Association, a trade association that represents wireless LifeLine providers, brought this suit in the district court against the Commission. The Association's unverified complaint sought a declaratory judgment that Section 332(c)(3)(A) of the Communications Act, 47 U.S.C. § 332(c)(3)(A), preempts the 2020 Rule and further sought an injunction against enforcement of that Rule.

After the Commission answered, the Association moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. Full briefing ensued, in which the Commission challenged the Association's standing as well as defended on the merits. On May 5, 2021, the district court granted the motion by simply entering, with minor modifications, the Association's proposed order granting declaratory and injunctive relief.

After the Commission took this timely appeal, the 2020 Rule lapsed on its own terms on November 30, 2021. At argument, counsel informed us that the Commission did not renew the 2020 Rule for the period of December 1, 2021, to November 30, 2022. The Commission also took no position on whether it would reinstate the Rule in the future.

## II

On appeal, the Commission again challenges the associational and direct standing of the Association. I begin with associational standing.

A

"To have associational standing, [an] organization must show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Family Farm Coal. v. U.S. EPA*, 966 F.3d 893, 908 (9th Cir. 2020) (cleaned up).

As to the first of these elements—the only one in dispute here—an association must allege that "a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (*AGC*) (citing *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012)).

For purposes of assessing the standing of the Association's members, all we have are the allegations of its unverified complaint. Before examining those allegations, I pause to emphasize the unusual procedural posture here. The district court granted a Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings *filed by the plaintiff*—i.e., by the Association. That the Association was the moving party makes all the difference for purposes of our standard of review.

3

In most cases involving motions for judgment on the pleadings, the defendant is the moving party, and for that reason some cases equate the Rule 12(c) standard with the Rule 12(b)(6) standard in terms of the court construing the complaint's allegations as true. *See, e.g.*, *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (stating that "[a]nalysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy") (cleaned up).

But in the Rule 12(c) context, whether the complaint's allegations are taken as true turns on which side is the moving party. "When considering a Rule 12(c) dismissal, *we must accept the facts as pled by the nonmovant*"—here, the Commission. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1053 (9th Cir. 2011) (emphasis added). "For purposes of a motion for judgment on the pleadings, all allegations of fact *of the opposing party* are accepted as true. The allegations of the moving party which have been denied *are taken as false*." *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967) (emphasis added). Therefore, where—as here—the plaintiff moves for judgment on the pleadings, the *denials in the answer* must be construed as being true. *City of Forsyth v. Mtn. States Power Co.*, 127 F.2d 583, 584 (9th Cir. 1942).

Moreover, again as in the more familiar Rule 12(b)(6) context, the court must draw all reasonable inferences in favor of the non-moving party. *Carillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1218 (9th Cir. 2015). "Thus, in effect, the party opposing the motion has the benefit of all possible favorable assumptions." 5C Wright & Miller, *Federal Practice & Procedure: Civil* § 1368 (3d ed. 2022 update). In this case, that means that any reasonable inferences must be drawn in favor of the Commission (the party opposing the motion) and against the Association (the party seeking judgment on the pleadings).

With these background principles in mind, I turn to the handful of allegations of the Association's complaint that arguably allege injury. Paragraphs 8 and 14 aver that the Commission denied requests by two of the Association's members, StandUp Wireless and SafetyNet Wireless, to charge copays to LifeLine subscribers in the two relevant tiers during the 12-month period covered by the 2020 Rule. The Commission admits it denied these requests. Read in isolation, the Commission's admission that it denied relief supports standing.

But Paragraph 8 also alleges that absent the 2020 Rule, the Association's members, including StandUp and SafetyNet, "would likely have to charge [copays to] LifeLine subscribers" in these tiers. Paragraph 68 substantially repeats this allegation and further avers, along the same lines, that the Commission's "decision to increase the [minimum service standards, i.e., the level of voice and data service]

5

without increasing the [subsidy] means that service providers would not be able to offer those plans for free, but the Free Rate Rule prevents [the Association's] members from charging for the services."

Critically for standing purposes, the Commission denies the allegations that the Association's members "would likely" charge copays absent the 2020 Rule. The Commission similarly denies the allegation that the Association's members "would not be able to offer those plans" absent the requested copays. We must therefore assume, consistent with these denials, that the Association's members—including StandUp and SafetyNet, the two identified members that sought relief from the 2020 Rule—would provide service and likely *not* charge copays absent that Rule. That necessarily means that StandUp, SafetyNet, and the Association's other members were *not* injured by the Commission's denial of relief, and therefore lack standing.

To support its standing determination, the majority also relies upon the Association's allegation—which the majority characterizes as "undenied"—that before the 2020 Rule, some members offered 3 GB plans at no cost to subscribers in exchange for California LifeLine's $14.85 subsidy, whereas the Rule requires that those members offer 6 GB of service for the same subsidiary amount. Mem. at 6. But in response to the Association's allegation that some members offered 3 GB plans at no cost in exchange for the $14.85 subsidy, the Commission stated that it "lack[ed] sufficient knowledge as to specific service offerings by [the Association's]

6

members described in Paragraph 3." That statement operates as a denial of the Association's allegation. *See* Fed. R. Civ. P. 8(b)(5) ("A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, *and the statement has the effect of a denial*.") (emphasis added). Thus, on this record we have no basis to conclude, as the majority does, that the 2020 Rule requires the Association's members "to provide *additional* data without an increased subsidy." Mem. at 7 (emphasis added).

Finally, the Association argues in its brief that enforcement of the Rule would prompt its members to *cease* providing LifeLine service, thereby resulting in the loss of subscribers and associated revenue (a different injury that would easily support standing). The problem, however, is that the Association failed to allege any such injury in its complaint, much less submit a declaration to that effect. An argument in an appellate brief can't patch holes in the district court record.

\* \* \*

On this record, the Commission's answer denies in all material respects the Association's allegation of injury to its members. Given this procedural posture, we must accept those denials as true, and therefore the members lack standing. The absence of standing of any of its members necessarily means that the Association lacks associational standing.

B

The Association also argues that the 2020 Rule inflicts direct injury on it as an organization. It asks us to infer that it "expended significant resources and effort" opposing the 2020 Rule, and that such advocacy "divert[ed]" its "resources." The Association's complaint, however, made no such allegations of direct injury, and we draw all reasonable inferences in favor of the nonmoving party—the Commission. The Association's contention that it has direct standing therefore fails.

III

In response to our order that the parties address the lapse of the 2020 Rule[2] at oral argument, the Commission asserts that this case is moot. For its part, the Association contends that because the Commission is free to reenact the 2020 Rule in the future, this case falls within the capable-of-repetition exception to mootness.

"[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

---

[2] The majority contends that "[c]ontinued participation in California LifeLine *requires* compliance with the 2020 Rule." Mem. at 6 n.2 (emphasis added). If the majority means participation in the LifeLine program in 2020 *required* compliance with the 2020 Rule, I agree. If the majority means that participation in the program *after* 2020 requires such compliance, then the majority is mistaken, because the Rule has lapsed.

Here, even assuming the Commission is likely to reenact the 2020 Rule, the record shows no reason to assume the Association's members will offer LifeLine service indefinitely into the future. The complaint lacks any undenied allegation that the Association's members have any interest in participating in the LifeLine program *after* 2020. The majority appears to infer such a continuing interest, but in this case's unusual posture, we must give all reasonable inferences to the Commission—not the Association. For all we know on this record, the Association's members have no such interest. Therefore, the Association has not made "a reasonable showing that [it] will again be subjected to the alleged illegality," *Lyons*, 461 U.S. at 109, and the capable-of-repetition doctrine does not save this case from mootness.[3]

---

[3] I note that the Association could have easily avoided these justiciability problems by submitting declarations and moving for summary judgment, but we take the record as we find it.